UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
MICHAEL LEIDIG and CENTRAL EUROPEAN
NEWS LTD,                                                                                        :
                               Plaintiffs,
                                                    :     16-CV-
        -against-
                                                           :     <u>COMPLAINT</u>

BUZZFEED, INC.,                                                                                 :

                                Defendant.                          :
-------------------------------------------------------------------------------x

      Plaintiffs, Michael Leidig and Central European News Ltd, by their attorney, Harry H. Wise, III, as their complaint against defendant, allege and show:

      1.      On April 24, 2015, defendant published, of and concerning the plaintiffs, an article with the headline "The King of Bullsh*t News" (hereinafter "the publication" or "defendant's publication").  A true copy of the publication is annexed hereto as Exhibit A.  The publication was made by posting the story on defendant's web site.

      2.      By its headline, defendant intended to and did assert that plaintiffs were "The King of Bullshit News."

      3.      By "The King of Bullshit News," defendant intended to and did assert that plaintiffs were in the business of publishing news articles presented as true that are false, and known to be false by plaintiffs, and that plaintiffs are the largest purveyors of such articles in the world.

      4.      The headline set forth in paragraph 1 was, and is, false.

      5.      The headline set forth in paragraph 1 was, and is, defamatory of plaintiffs.

1

6.   The headline forth in paragraph 1 was published with reckless disregard for whether it was true or false, and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

7.   In the publication, defendant said, of and concerning the plaintiffs:

"But then the bottom fell out of the business … after 9/11, and it seemingly never recovered.

\* \* \*

So it appears that Leidig decided to play the online game, as he saw it. He launched websites such as the *Austrian Times* and *Croatian Times*. He cast his net far afield to China, India, and Latin America, scouring for images and posts on social networks that he could weave a story around in order to hit up old clients with a new kind of content."

8.   By the part of the publication set forth in paragraph 7, defendant intended to and did assert that, suffering from financial difficulties, plaintiffs decided to go into the business of fabricating and selling fake news stories.

9.   At the time it published the words set forth in paragraph 7, defendant had spoken with no persons who had said that, suffering from financial difficulties, plaintiffs had decided to go into the business of fabricating and selling fake news stories.

10.   At the time it published the words set forth in paragraph 7, defendant had seen no documents suggesting that, suffering from financial difficulties, plaintiffs had decided to go into the business of fabricating and selling fake news stories.

11.   The words set forth in paragraph 7 were and are false.

12.   The words set forth in paragraph 7 were and are defamatory of plaintiffs.

13.   The words set forth in paragraph 7 were published with reckless disregard for whether they were true or false, and in a grossly irresponsible manner without due consideration

for the standards of information gathering and dissemination ordinarily followed by responsible parties.

## The Parties

14. Plaintiff Michael Leidig is a citizen of Great Britain who lives and works in Vienna, Austria.

15. Plaintiff Central European News Ltd ("CEN") is a corporation organized under the laws of Great Britain with its principal place of business in England.

16. Upon information and belief, defendant, BuzzFeed, Inc. (hereinafter "BuzzFeed" or "defendant"), is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of New York, County of New York.

## Jurisdiction and Venue

17. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(2), in that the matter in controversy exceeds the sum of $75,000.00 and is between a citizen of this State and citizens of a foreign state.

18. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(1), in that defendant resides in this district.

## Facts

19. BuzzFeed is a news and entertainment website that mixes original reporting, user-generated work, and aggregations from other websites.

20. BuzzFeed is one of the ten most-visited news and information websites in the United States.

21. People around the world pay more than 5 billion visits to BuzzFeed's web site each month.

22.     Plaintiff Michael Leidig is a journalist who has had a successful and, until the publication in issue here, unblemished career. He has worked in broadcasting, print, magazine, and online journalism, and has done investigative stories. He has also been a sub-editor responsible for editing news copy, and has written and had published several books. In 2006, a three-part series he did for the Sunday Telegraph on the trafficking of women was nominated for an Amnesty award and also won the Paul Foot award, a British award for exceptional journalism. He is currently the vice-chairman of the National Association of Press Agencies, a British press organization, responsible for its special projects, including setting up its legal-aid program and a national media project to support freelance journalistic work.

23.     Plaintiff Central European News Ltd is a news agency founded by Mr. Leidig in 1995. Its main business is providing news from non-English-language countries to clients in the British press and elsewhere. Some other aspects of its business have included creating the English-language news for the respected Austrian daily newspaper *Die Presse,* and also producing the English-language pages of the world's oldest newspaper in continuous operation, *The Wiener Zeitung*.

Defendant's Publication

24.     One of three bylined authors of defendant's defamatory publication was BuzzFeed reporter Alan White.

25.     When he approached Mr. Leidig about the possible story, Mr. White said, in an email:

> "As I mentioned previously, I understand that you are producing this viral content for sale in order to fund your laudable investigative journalism, such as your report into the issue of child trafficking in Europe, and I am keen to reflect this fact in the article."

26.     Upon information and belief, based on the publication as posted on defendant's web site, the statement set forth in the preceding paragraph was a lie, in that Mr. White had no intention of discussing any of plaintiffs' laudable work, but only wished to smear and defame plaintiffs as journalistic frauds.

27.     In the publication, defendant also said, with respect to a story plaintiffs had published concerning people in China walking cabbages, rather than pets, out of loneliness:

> The story included quotes from "Chinese psychiatrist Wen Chao", explaining how walking a cabbage on a lead can help reduce feelings of isolation, and a 17-year-old called Lui Ja Chen, who supposedly said:
>
>> I feel I can transfer my negative thoughts about myself to the cabbage, go for a walk with it and come home feeling better about myself.
>
> The pictures were credited to CEN, and the same quotes appeared on the *Austrian Times* site.
>
> Unsurprisingly, the story was quickly debunked, by *K*otaku, BuzzFeed, and the *Wall Street Journal.* The teens were not walking cabbages because they were lonely: they were walking cabbages as part of an art event at a music festival by Chinese artist Han Bing (who has been walking cabbages as part of his art for over a decade).

28.     By the passage quoted in the preceding paragraph, defendant intended to and did imply that plaintiffs' story was untrue, and that it was made up by plaintiffs, and that plaintiffs had made up quotes from non-existent persons.

29.     The implication of the words quoted in paragraph 27 was and is defamatory of plaintiffs.

30.     The implication of the words quoted in paragraph 27 was and is false.

31.     Young people in China had walked cabbages out of loneliness; the persons quoted in the CEN story were real and the quotes correct; and the story was widely re-published in

5

China, leading to some public-opinion surveys conducted about the phenomenon, which led to further news stories there.

32. The words set forth in paragraph 27 were published with reckless disregard for whether their implication was true or false, and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

33. In the publication, defendant also said of plaintiffs' stories:

> CEN's stories frequently contain lines from someone that no one else could persuade to talk, including the local media. And many of those quotes, especially those from anonymous "officials", include phrases that one would expect to hear from someone who grew up in the UK.

34. By the words quoted in the preceding paragraph, defendant meant to and did imply that Mr. Leidig or others at CEN frequently make up quotes included in CEN's stories.

35. The implication set forth in the preceding paragraph was and is defamatory of plaintiffs.

36. The implication set forth in paragraph 34 was and is false.

37. The words set forth in paragraph 33 were published with reckless disregard for whether their implication was true or false, and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

38. Defendant's publication also said, of and concerning plaintiffs, concerning a story that plaintiffs had published about a Chinese man who had reportedly gotten tapeworm from eating too much sashimi, which story was accompanied by a photo purporting to be a photo of the man's x-ray showing the spots of disseminated cysticercosis:

> Soon after the story made the rounds, it was investigated by the debunking

site Snopes, which found that the x-ray photos of the alleged victim were "similar to those included in a 2014 case report published by the *British Medical Journal* that dealt with a man who contracted a rare case of disseminated cysticercosis through the consumption of uncooked pork (with no mention of raw fish)". It does not appear that CEN ever alerted its customers to the fact that the images had been debunked; the original story remains online at the *Daily Mail* and elsewhere.

39. By the words quoted in the preceding paragraph, defendant intended to and did assert that plaintiffs had used an x-ray of some other person and passed it off as an x-ray of the Chinese man they were writing about, and failed to make a correction when this was revealed.

40. Before publishing the words set forth in paragraph 38, defendant did nothing to determine whether the photo of the x-ray included by plaintiffs in their story was genuine or not.

41. Any investigation by defendant would have revealed that the story had been published by numerous news agencies in China with the same photograph, and that a broadcast report had included an explanation of a Chinese doctor, Dr. Huang Huicong of Wenzhou Medical University, that, among other things, attested to the authenticity of the x-ray.

42. The words set forth in paragraph 38 were and are false.

43. The words set forth in paragraph 38 were and are defamatory of plaintiffs.

44. In publishing the words set forth in paragraphs 38, without doing anything to verify whether they were true or false, defendant acted with reckless disregard for whether they were true or false, and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

45. In the publication, defendant also included an assertion, of and concerning the plaintiffs, with respect to a story plaintiffs had published, which was described in defendant's publication as a "CEN story about a [Russian] woman named Elena Lenina, who dyed her kitten pink, which supposedly caused the animal's death from blood poisoning."

7

46.  With respect to that story, defendant said:

"As *Gawker's* Antiviral site pointed out, the story was false. The kitten was not dead. Lenina was in fact simply posting pictures of her—very much alive—kitten on social media.

As with the Sandoval case, this appears to be a situation where CEN sold a false (and potentially defamatory) story about a about a real person with little regard for the consequences that person would face when the story went viral. Nor has there been any apparent attempt to correct the story since it was proved to be false."

47.  By the words quoted in the preceding paragraph, defendant intended to and did assert that plaintiffs are intentional purveyors of false stories, and do not care whether they injure any persons by their publications, and persist in such conduct even after a story is proven to be false.

48.  Defendant's assertion set forth in paragraph 47 was and is false.

49.  Defendant's assertion set forth in paragraph 47 was and is defamatory of plaintiffs.

50.  Before publishing the words quoted in paragraph 46, defendant made no investigation to determine whether their assertion was true or false.

51.  If defendant had made any investigation of the story, it would have found the following facts, set forth in paragraphs 52 and 53 below:

52.  Ms. Lenina is a well-known public figure in Russia, with a public persona based on outrageous conduct. She has posed nude in magazines, refused to wear a seatbelt because, she said, her breasts were too big, and once claimed to be keeping a man as a pet slave on a leash.

53.  The lead on CEN's story was as follows: "Russian author Lena Lenina is under fire from animal rights activists after having her cat dyed pink shortly before it died of toxic

8

poisoning." That Ms. Lenina was under fire for the alleged poisoning was quite true. Under fire (thousands of people signed a petition calling for her to be jailed), she claimed to have tracked down the cat, which she had given away, and posted pictures on Twitter claiming it was alive and well. So, quite properly, CEN then published a story headlined "Pretty in Pink Kitten is Still Alive Claims Star." That story, again, was quite true, and accurately reported the newsworthy events. Ms. Lenina's posts failed to end the controversy, as there were many posts by others suggesting that the new pictures did not resemble the original cat.

54. In publishing the false and defamatory words set forth in paragraph 46, without doing anything to investigate whether their charges against plaintiffs were true or false, defendant acted with reckless disregard for whether they were true or false, and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

55. In the publication, defendant also said, of and concerning plaintiffs, with respect to a story plaintiffs had published concerning some Russian women who stripped in public and lost their jobs as a result:

> "[I]t appears that CEN took the photos, invented a newsworthy narrative, inserted false names for the women, credited a nonexistent photographer, and fabricated four sets of quotes to fill out the text."

56. By this part of the publication, defendant meant to and did accuse plaintiffs of creating a false news story and fraudulently selling it as true.

57. Defendant's assertions set forth in paragraph 55 are false.

58. Defendant's assertions set forth in paragraph 55 are defamatory of plaintiffs.

59. In publishing the words set out in paragraph 55, defendant made no investigation as to whether the charges it made against plaintiffs were true or false.

9

60. Any investigation would have revealed that, prior to plaintiffs publishing it, the story had appeared in Russian media, and thus was not created by plaintiffs.

61. In publishing the words set forth in paragraph 55 without investigating whether they were true or false, defendant acted with reckless disregard for whether they were true or false, and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

62. As an additional part of its publication, defendant said, concerning a story that plaintiffs had published about the birth of a two-headed goat on a farm in China, that an "expert" had said of a photograph accompanying the story that it appeared to be a "digitally enhanced." Defendant also said:

"A Xinhua journalist who claims to have seen the goat in person didn't get the farmer to talk, but a news agency based in Vienna somehow did, despite the story taking place in a remote rural community a six-hour train ride from Beijing."

63. By the words quoted in the preceding paragraph, defendant meant to and did imply that plaintiffs had published a faked photograph and had invented quotes to make a story more interesting.

64. The implication set forth in paragraph 63 was and is false.

65. The implication set forth in paragraph 63 was and is defamatory of plaintiffs.

66. Before publishing the words set forth in paragraph 62, defendant conducted no investigation in China concerning the story.

67. Any investigation in China would have revealed that the story, originally published by the Xinhua News Agency, China's official state press agency, had been accompanied by a video showing the goat, and that other press agencies in China had published

the story, with photographs, and with interviews of the farmer, prior to the publication by plaintiffs.

68. In publishing the words set forth in paragraph 62 of and concerning the plaintiffs, while making no investigation in China as to whether their implications were true or false, defendant acted with reckless disregard for whether its implications were true or false, and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

### Facts with Respect to Damages

69. Defendant's publication has damaged the reputation of plaintiff Michael Leidig.

70. Defendant's publication has damaged the reputation of plaintiff Central European News, Ltd.

71. Since the day defendant published the article concerning plaintiffs, anyone searching on a major search engine for either Michael Leidig or Central European News will see, on the first page of the list of responses, a link to defendant's publication, "The King of Bullsh*t News."

72. Defendant's publication was republished by it in different languages, and was also republished by others in multiple languages, a fact reasonably foreseeable by, and intended by, defendant.

73. Many clients of plaintiff CEN simply stopped using its news service with no inquiry about whether the charges in defendant's publication were true or false.

74. In Sweden, faced with questions from local news media about defendant's publication, *All Over Press*, a picture-syndication agency and partner of CEN, responded that they had stopped using CEN, and they have done so.

75. In Switzerland, *20 Mins*, a news web site and partner of CEN, confirmed that they would no longer work with CEN.

76. In England, CEN's second biggest client, the *Daily Mirror* announced that it would only use CEN stories if it was absolutely necessary. That client is now using CEN again, but at a much-reduced level from the period before defendant's publication.

77. CEN's sales in early 2015 were, by month, January 830, February 948, March 1070, April 935, May 682, June 626, and July 727. Thus, defendant's publication in April produced a reduction in defendant CEN's sales of about 30%.

78. In addition, CEN clients are now making more queries, increasing CEN's overhead for each story, and some clients are demanding lower rates per story.

79. As a direct result of defendant's publication, plaintiff CEN lost a potential high-six-figure investment that had been in the works for many months. The investment was to fund the development of new software allowing journalists to deal directly with customers for their work. As of the beginning of April 2015, the investment bank involved was representing that it had an investor who was keen on the proposed product; after defendant's publication, the potential investor disappeared.

80. Shortly after defendant's publication, Mr. Leidig traveled to England to visit his father, a meeting arranged so that Mr. Leidig could celebrate his 50th birthday with his family.

81. Instead of a joyful family reunion, the event was dominated by a discussion of defendant's publication, and the possible consequences for Mr. Leidig, including the possible closure of CEN and the ending of his career in disgrace.

82. The day after Mr. Leidig and his father had spent the evening discussing these matters, his father had a massive stroke that left him unable to communicate with others, a condition not expected to change for the rest of his life.

83. Thus the last memories Mr. Leidig's father had of him were of disgrace and possible ruin as "The King of Bullshit News."

Facts with Respect to Punitive Damages

84. "Viral News" refers to stories that, because they are quirky or funny or otherwise unusual, are likely to be spread around the internet as readers decide to share them with others on social media, such as Facebook.

85. One of defendant's business objectives is to obtain a greater share of the market for viral news in Great Britain and elsewhere around the world.

86. The part of plaintiff CEN's business attacked by defendant in its publication was the dissemination of viral news in Great Britain and elsewhere.

87. Defendant knew that, if its publication injured plaintiff CEN's business in Great Britain and elsewhere, defendant's own business would increase.

88. Defendant maliciously intended that its publication injure the viral-news business of plaintiff CEN, and thereby benefit the business of defendant.

89. Defendant had been, prior to its publication of its story about plaintiffs, publicly criticized for publishing stories without verifying whether they were true or false.

90. Prior to publication, defendant was put on notice by lawyers for plaintiffs that the story it was about to publish was "highly defamatory" of plaintiffs and "likely to cause serious reputational harm."

91. Despite this notification, defendant chose to publish the story anyway.

92. Since the publication by defendant, defendant has been informed of the falsehoods in its publication set forth in this complaint, and of other false and defamatory statements in the publication.

93. Despite being so informed, defendant has refused to take the defamatory and false publication down from its web site or otherwise retract it.

<u>AS A FIRST CLAIM FOR RELIEF, BY PLAINTIFF MICHAEL LEIDIG, FOR LIBEL</u>

94. Plaintiff Michael Leidig hereby realleges the allegations of paragraphs 1 through 93.

95. As a result of defendant's publication, plaintiff Michael Leidig has been seriously damaged in his reputation, in the amount of five million dollars ($5,000,000.00).

96. Defendant is liable to plaintiff Michael Leidig in the amount of five million dollars ($5,000,000.00).

97. Because defendant's publication was the result of malice toward plaintiff Michael Leidig and his company, Mr. Leidig is entitled to punitive damages in an amount to be determined by the jury at trial.

AS A SECOND CLAIM FOR RELIEF, BY PLAINTIFF
<u>CENTRAL EUROPEAN NEWS LTD, FOR LIBEL.</u>

98. Plaintiff Central European News Ltd, hereby realleges the allegations of paragraphs 1 through 93.

99. As a result of defendant's publication, plaintiff Central European News Ltd has been seriously damaged in its reputation, in the amount of five million dollars ($5,000.000.00).

100. Defendant is liable to plaintiff Central European News Ltd in the amount of five million dollars. ($5,000,000.00).

101. As a result of defendant's publication, plaintiff Central European News, Ltd has suffered special damages in an amount to be determined by the jury at trial, as follows:

--a substantial reduction in its monthly sales of stories;

--the loss of long-time clients and partners, including *All Over Press, and 20 mins,* and the reduction in usage by partners such as the *Daily Mirror*;

--the loss of a high-six-figure investment that had been under discussion for many months;

--increased expenses occasioned by clients requesting more verification;

--the shutdown of CEN's investigations unit;

--the shutdown of CEN's online publishing products;

amounting in all to approximately $1,040,000.00;

102. Defendant is therefore liable to plaintiff Central European News, Ltd for special damages to be determined at trial but approximately $1,040,000.00;

103. Because plaintiff CEN's injury was the result of malice on the part of defendant, CEN is entitled to punitive damages in an amount to be determined at trial.

WHEREFORE, plaintiffs demand judgment as follows:

ON THE FIRST CLAIM FOR RELIEF, on behalf of plaintiff Michael Leidig, general damages in the amount of $5,000,000.00 and punitive damages as determined by the jury at trial;

ON THE SECOND CLAIM FOR RELIEF, on behalf of plaintiff Central European News, Ltd, general damages in the amount of $5,000,000.00, special damages as determined at trial in an approximate amount of $1,040,000.00; and punitive damages in an amount to be determined at trial;

together with the costs and disbursements of this action.

<u>Jury Demand</u>

Plaintiffs demand trial by jury.

<u>s/Harry H. Wise, III</u>
HARRY H. WISE, III (HW6841)
  *Attorney for Plaintiffs*
43 West 43rd Street, suite 109
New York, N.Y. 10036-7424
(212) 709-8034
hwiselaw@aol.com
