# EXHIBIT 6

**To the Sept. 12, 2018 Declaration of Harry H. Wise, III**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 0:17-CV-60426-UU

-----------------------------------------

MICHAEL LEIDIG and CENTRAL EUROPEAN NEWS, LTD.,

Plaintiffs,

-against-

BUZZFEED, INC.,

Defendants.

-----------------------------------------

CONFIDENTIAL TRANSCRIPT OF
VIDEOTAPED DEPOSITION
OF BENJAMIN SMITH

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TAB PREWETT, a Registered Professional Reporter, a Certified Shorthand Reporter, a Certified LiveNote Reporter, and Notary Public, held at the Offices of DAVIS WRIGHT TREMAINE LLP, 1251 Avenue of the Americas, 21st Floor, New York, New York 10020, on Friday, June 8, 2018, commencing at 9:44 a.m.

A P P E A R A N C E S:

DAVIS WRIGHT TREMAINE LLP
BY: KATHERINE M. BOLGER, ESQ.
1251 Avenue of the Americas
New York, New York 10020
Attorneys for the Defendant, Ben Smith
katebolger@dwt.com
212 402 4068

Law Offices of HARRY H. WISE
BY: HARRY H. WISE, ESQ.
43 West 43rd Street
New York, New York 10036
Attorneys for the Plaintiffs
hwise@aol.com
212 810 2430

Also Present: Michael Leidig, Plaintiff

James Soto, Videographer

Nabiha Syed, In-House Counsel
BuzzFeed

Benjamin Smith

P R O C E E D I N G S

THE VIDEOGRAPHER: Stand by. Good morning. We are on the record. The time on the monitor is 9:44. Today's date is June 8, 2018. We are here at 1251 Avenue of the Americas, New York, New York, for the purpose of taking the videotaped deposition of Mr. Benjamin Smith in the matter of Leidig, et al., versus BuzzFeed, Inc. The videographer is James Soto. The court reporter is Tab Prewett, both with US Legal Support.

Will counsel please identify themselves for the record.

MR. WISE: For plaintiffs, Harry Wise.

MS. BOLGER: Kate Bolger on behalf of the defendant.

THE VIDEOGRAPHER: Thank you. Please administer the oath.

B E N J A M I N S M I T H,
doing business at BuzzFeed,
111 East 18th Street,
New York, New York 10003,

Benjamin Smith

having been sworn by the notary public to testify to the truth, testified as follows:

DIRECT EXAMINATION

BY MR. WISE:

Q Good morning, Mr. Smith.

A Good morning.

Q As you know, my name is Harry Wise. I am the lawyer representing the plaintiffs in the suit against BuzzFeed. I am going to ask you some questions this morning.

Firstly, just let me ask you:

Do you -- is there any reason you think aren't able this morning to adequately respond to my questions?

A No.

Q Can we have an agreement that, if you think you have misunderstood or you think you might have misunderstood a question, that you will tell me so that I can rephrase it until you believe you understood it.

A Yes.

Q Could you state your name and address for the record, please.

A My name is Benjamin Smith. My

Benjamin Smith

address is 111 East 18th Street, New York, New York. That's the address of BuzzFeed.

Q Are you currently employed by BuzzFeed?

A Yes.

Q What is your title at BuzzFeed?

A Editor in chief of BuzzFeed news.

Q Are you an American citizen?

A Yes.

Q Where did you grow up?

A New York, New York City.

Q Are you a college graduate?

A Yes.

Q Where did you graduate college?

A Yale University.

Q What year was that?

A 1999.

Q What was your major at Yale University?

A Linguistics.

Q Did you work on the newspaper at Yale?

A No.

Q Did you work on any publications at

Benjamin Smith

Yale?

A Yes.

Q Which publications did you work on?

A I worked on a weekly -- a weekly paper called the Yale Herald, but mostly on a magazine called The New Journal.

Q What did you do for The New Journal?

A I wrote articles.

Q Was there any particular topic that you wrote about?

A I wrote a number of articles on different topics.

Q Have you continued your education since graduation from Yale?

A Can you be more specific.

Q Yes. Have you gone to any formal educational institutions since graduation from college?

A No.

Q Did you enter the work force upon your graduation from college?

A Yes.

Q What did you do?

Benjamin Smith

A Would you like me to go chronologically.

Q Yes, it doesn't have to be in any great detail. Just in general, what did you do at various places?

MS. BOLGER: Objection. You can answer.

THE WITNESS: Sorry. Sorry.

MS. BOLGER: I was objecting to the form of the question, but you can answer.

A Immediately after college, I had a fellowship called the Pulliam Fellowship at the Indianapolis -- Pulliam, P-u-l-l-i-a-m, at the Indianapolis Star, which is the metro newspaper in Indianapolis, Indiana. I covered crime and courts for them.

After that I went to work for the Baltic Times, which is an English language newspaper in Riga, Latvia. After that, I became a stringer, which is a kind of freelance writer with a retainer for the Wall Street Journal, Europe, which is the European edition of the Wall Street Journal, published in Brussels.

I was based in Riga, Latvia, and

Benjamin Smith

covered stories around that region.

And after that -- and do you want dates? Do you want --

Q Well, I may go back and ask you. You can just continue for now.

A Okay. After that, I was a -- the City Hall reporter for the New York Sun, which was a daily newspaper in New York City. After that, I covered New York politics for the New York Observer, and then the New York Daily News.

And then I covered national American politics for Politico. And then I came to BuzzFeed in 2011.

Q When did you work for the Sun?

A How specifically do you want it? I don't think I have the exact dates.

Q Years would be fine.

A From 2001 to 2003.

Q And then you went to the Observer directly from there?

A Yes.

Q What years did you work for the Observer?

Benjamin Smith

Gazette story change the schedule for publishing the CEN story in any way?

A I don't remember.

(Exhibit No. Smith I, E-Mail chain, top E-Mail dated 4/24/15 from Luke Lewis to Robert Colvile; Subject: Can we strengthen the hed [sic], Bates Nos. BuzzFeed 11741 to 11743, Document is marked by the reporter for identification.)

Q Does this document, Mr. Smith, appear to be a discussion of the potential headline for the story?

MS. BOLGER: Feel free to read it, Ben. Take your time.

MR. WISE: Sure.

A A potential headline?

Q Yes.

A I believe it was -- it was a discussion of headlines. I think it was after the publication of the story.

Q Did you have a particular choice that you favored for the headline for the story?

A I like the headline that we published it -- that we -- that we put on top of

Benjamin Smith

it, "The King of Bullshit News."

I guess, I believed as -- you know, as we discussed here, that the original headline had been "The King of Weird News," which I thought understated, you know, the extent to which it was a damning indictment rather than a quickie feature, and that the word "bullshit" in case really reflects that it was both weird and false.

And we discussed, should we call it "weird news"? Should we call it "false news" because it was both? And we thought that the word bullshit encapsulated those two things.

Q And you did think that it was a "damning indictment"?

A Yes.

Q After the piece was published, did you become aware that Mr. Leidig had written Janine Gibson about the piece?

A I don't recall.

Q Do you recall having any discussions with Janine Gibson about any communications from Mr. Leidig about the piece?

A I don't remember.

Benjamin Smith

information spreads on the internet.

I mean, they really devoted their careers to debunking it:

I mean, Craig Silverman, who, you know, has won a number of awards for this kind of work; Heidi Blake, a Pulitzer Prize finalist, who has done massive investigations of corruption in soccer before this; Tom Phillips, who, you know, is one of the central figures of the British news ecosystem, and who, now, I believe, runs a British fact-checking organization; and Alan White, who is a great award-winning journalist, who has worked very deeply in this space.

Q Was Tom Phillips let go by BuzzFeed after this article was published?

A You mean, are you asking me whether he was let go as a result of this article?

Q No, just that he -- has he been let go since the article was published?

A We -- we reduced staff in our British office, and I don't recall the exact terms of our parting with Tom.

Q But he's no longer at BuzzFeed, correct?

Benjamin Smith

A Yes.

Q Are you aware that confidential sources were used in the preparation of the story?

A Yeah, I just don't recall the details of reporting the story.

Q You don't know then where any confidential sources for this story worked?

MS. BOLGER: I'm going to object, and I am going to state again, Mr. Wise, that it's outrageous that you are asking him for a confidential source.

MR. WISE: I am not asking -- I am not asking for the name of any confidential sources. If I do that, you can object.

MS. BOLGER: You can answer, Ben.

A No, I wasn't personally, deeply involved in the reporting and the editing of the story or directing the reporters, and so I don't recall.

Q At the time BuzzFeed published the story on CEN and Mr. Leidig, you knew that the story would damage their reputations; did you not?

Benjamin Smith

A Yes.

Q In fact, the intention of the story was to damage their reputations; was it not?

A No.

Q What was the intention of the story?

A The intention -- the intention of the story was to reveal a set of accurate facts about an organization that had spread false information through the media, at times really done terrible damage to people's lives as well as to the business of journalism.

Q Who made the final decision to publish the story; was that you?

A Ultimately, yes. The buck stops at me. It's my decision.

Q You don't deny, do you, that labeling a journalist as "The King of Bullshit News" will damage his reputation?

A Sorry. Could you just make that question clearer.

Q I can repeat it.

A You are asking me if I don't -- just the -- just the double negative caught me --

Benjamin Smith

just ask me the question again.

Q Labeling a journalist as "The King of Bullshit News" will damage his reputation, correct?

A Yes.

Q And a story that a journalist has chosen to create news stories that are fake and to peddle them as real stories is going to damage that journalist's reputation, correct?

MS. BOLGER: Objection. Objection, but you can answer.

A Yes.

Q And you were comfortable publishing this story that would charge Mr. Leidig and his company with making up fake stories, correct?

MS. BOLGER: Object again. You can answer, Ben.

A I am always comfortable publishing stories that are true.

Q And you were -- you were comfortable publishing this one?

A We were -- we were -- we published this story because it was true. Yes, we were proud to publish it.

Benjamin Smith

Q At the time that the piece was published, what stories did you personally believe that Mr. Leidig had faked?

A The specific stories that were reported in our article as having -- you said -- I'm sorry. I believe that the stories that we reported in our article as being untrue were, in fact, untrue.

Q Can you recall any of those stories sitting here today?

A You know, I can't recall. But if you give me the article, I think, if I have it here, I can go through it.

Q I am not asking you to review the story.

A I mean, I don't recall. I don't recall the specific details, but I would love to go through the article with you.

Q We will do that.

Are you aware of any evidence other than what you see in the story itself that Michael Leidig has ever made up a fake news story and sold it as real?

A No.

Benjamin Smith

Q Are you aware of any evidence other than what's in the story itself that Michael Leidig has ever made up a phony quote and added it to a story?

A Well, you know, our reporting was -- is really substantially what I know about this.

Q So what you know is what you see in the story?

A Yes.

MS. BOLGER: Object. That's not what he said.

A Well, what I -- what I know is what I know from our reporter and what is in the story.

Q What do you know from your reporters about whether Mr. Leidig had ever made up a fake news story that we don't see in the story?

A I don't recall specific details.

Q And is the same about -- strike that.

What do you know, aside from what you see in the story, as to whether CEN ever made

Benjamin Smith

up or sold a fake news story as real?

A Well, I think the story is completely convincing; and, you know, on that point, so I know that it is true.

Q Are you aware of any evidence on that point other than what is seen in the story?

MS. BOLGER: Objection. Asked and answered. You can answer it again, Ben.

A I don't specifically recall.

When you get to a comfortable breaking point --

Q This is good.

A Is this good?

THE VIDEOGRAPHER: Going off the record. 10:32.

(A break is taken.)

THE VIDEOGRAPHER: Back on, 10:47.

Q I would like to show you show you, sir, a document we marked as -- previously as P for identification.

(Previously Marked Exhibit No. P. Complaint, Document is introduced into the proceedings.)

Q And ask you if you have ever seen

Benjamin Smith

it before?

A Yes.

Q And I would like you to turn to the second half of that document that appears to be a copy of the article we have been talking about, "The King of Bullshit News."

A Yes.

MS. BOLGER: Harry, before you start, for the record, my copy of this document is marked up.

MR. WISE: It's got some highlights and stuff on it?

MS. BOLGER: Yes.

MR. WISE: That's okay.

MS. BOLGER: Clearly, the plaintiff's file does not have it. I just didn't know what this was.

MR. WISE: Well, the way we are doing it, this -- the original of this is now somewhere with some other transcript, so this is what I have to work with.

MS. BOLGER: Okay.

Q Directing your attention to page four of 22, I think, is the top of page of

Benjamin Smith

one way or the other?

A No, I mean, I have read some of the documents in this case, but not all the court filings, so I can't -- I can't specifically recall if I have read this one.

Q Since you've been editor in chief at BuzzFeed, has BuzzFeed ever published a story that turned out to be a hoax?

A Yes.

Q When for the first time did that occur since you've come to BuzzFeed?

MS. BOLGER: Objection to the question.

A I can't recall the first time. It's a hazard of doing journalism, always has been.

Q Can you recall the second time?

A You know, it's something that has happened to every reporter through their career occasionally; and, you know, whenever we are tricked by a source, we correct very fully and clearly as quickly as we can.

And that has always been, you know, our practice, and that is good journalist

Benjamin Smith

practice. It's certainly -- economics -- you don't know if it's a deliberate hoax or if your source is confused, and sometimes you do know if it was deliberate.

But in any case you always -- it's just the practice in what we try to do -- is just to correct as quickly and as fully as we can.

Q How many times has BuzzFeed published a deliberate hoax since you became editor in chief?

MS. BOLGER: Objection to the question. I don't understand the question. I'd ask you to rephrase it. Has the -- who's the deliberate hoax -- I'd ask you to rephrase the question. Can you rephrase the question.

MR. WISE: I am not rephrasing the question.

A We have never deliberately published a hoax.

Q Have you published a story that you later learned was a deliberate hoax by someone else?

A Yes.

Benjamin Smith

you see a date?

A I don't see a date. And I am just trying to remember when -- what the story was and when it was published.

Q Well, I direct your attention to the second-to-the-last page of this as well and to the third paragraph up from the bottom where it appears to say, that, with your arrival at BuzzFeed:

"... the company's purpose has shifted somewhat, from amazing eyeballs with cool stuff, toward an old-fashioned desire to make a difference."

MS. BOLGER: I don't know where you are, Harry.

MR. WISE: Third paragraph from the bottom, second-to-the-last page.

MS. BOLGER: What -- what's the beginning of the paragraph?

A I see it: "As BuzzFeed's audience" --

Q "As BuzzFeed's audience...."

MS. BOLGER: Thank you.

A So what was the question?

Benjamin Smith

Q Whether it was true that you changed things there from what they had been doing before in terms of news versus entertainment?

A Yeah, I wouldn't put it exactly the way it was put here, but the way you put it is accurate.

Q What would -- how would you put it?

A I think what you just said was accurate.

Q Okay. Do you recall a BuzzFeed reporter named Benny Johnson?

A Yes.

Q Who was Benny Johnson?

A Benny Johnson was a reporter who we hired and who worked for us for -- actually, I'm not sure how long -- and who we fired when we discovered that he had been plagiarizing.

Q Did you first defend him as a deeply original writer before he was eventually fired?

A Yes.

(Exhibit No. Smith M, Politico story dated 12/17/13 entitled "BuzzFeed

Exhibit No. Smith J, Document 62

Exhibit No. Smith K, Document, front page a screen shot from "The Dish," entitled "The Truthiness of BuzzFeed" with tweet from Elan Gale, multi-page document, No Bates Nos. 66

Exhibit No. Smith L, Article from Columbia Journalism Review entitled "Who cares if it's true?," multi-page document, No Bates Nos. 68

Exhibit No. Smith M, Politico story dated 12/17/13 entitled "BuzzFeed editor defends reporting practices," by Hadas Gold, Document, No Bates Nos. 70

Exhibit No. Smith N, Article from New Rock Stars, dated 3/10/15 by NMR Staff, entitled "Did BuzzFeed rip off the Fine Bros?," Document, No Bates Nos. 74

Portion of transcript designated confidential 76

CERTIFICATE

I, TAB PREWETT, A Registered Professional Reporter, Notary Public, Certified LiveNote Reporter, and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination BENJAMIN SMITH was sworn by the notary public to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

TAB Prewett

Notary Public

My Commission expires February 9, 2019
Dated: June 18, 2018